IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LAVELLE SANDERS, | ) | Case No. 1:18-cv-1941 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Lavelle Sanders, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XIV of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Sanders' applications for disability insurance and supplemental security income benefits be AFFIRMED.

## II.      Procedural History

On January 20, 2015, Sanders applied for DIB and SSI.  (Tr. 271-80).[1]  Sanders alleged that he became disabled on January 1, 2006, due to a "spot on his lungs that cause[d] bleeding,

---

[1] The administrative transcript is in ECF Doc. 10.

asthma, depression, anxiety disorder, cloister phob[ia], bones in body that break easily, [and] schizophrenia." (Tr. 71, 85, 100, 119, 139, 157, 271, 275). The Social Security Administration denied Sanders' applications initially and upon reconsideration. (Tr. 71-173). Sanders requested an administrative hearing. (Tr. 197-98). ALJ Penny Loucas heard Sanders' case on September 25, 2017, and denied the claims in a January 30, 2018, decision. (Tr. 7-70). On June 27, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). On August 23, 2018, Sanders filed a complaint to seek judicial review of the Commissioner's decision. ECF Doc. 1.

III.   **Evidence**

    **A.   Personal, Educational and Vocational Evidence**

Sanders was born on August 19, 1984, and he was 30 years old when he filed his applications. (Tr. 271). Sanders was in special education classes since the fourth grade, and he dropped out of high school in the tenth grade. (Tr. 27, 63, 604). Sanders did not have any past relevant work experience. (Tr. 41).

    **B.   Relevant Medical Evidence**

        **1.   Physical Health Records**

On March 19, 2010, Jeffrey Conklin, MD, noted that Sanders had a history of pain in his shoulder due to a past wrestling injury, that he had asthma, and that he smoked one-third a pack of cigarettes per day. (Tr. 393). Sanders also told Dr. Conklin that he had anxiety, depression, difficulty concentrating, and excessive alcohol consumption. (Tr. 394). Dr. Conklin noted that Sanders had a normal gait, referred Sanders to physical therapy for his shoulder, and referred him to a social work service for his mental health problems, alcohol use, and tobacco use. (Tr. 395).

On March 31, 2010, Sanders went to the emergency department for low back pain, urinary hesitancy, and a toothache.  (Tr. 482).  Sanders told Marymichael Werick, MD, that his back pain had lasted for two weeks and that it was worse with movement and stretching. (Tr. 482).  On examination, Dr. Werick noted that Sanders had normal breathing; was awake, alert, and oriented; and did not have any apparent musculoskeletal issues.  (Tr. 483).  Dr. Werick prescribed Sanders pain medication and penicillin.  (Tr. 483)

On April 26, 2010, Sanders told Joseph Yonke, PA-C, that he had "progressive" back pain after a car wreck on April 21, 2010.  (Tr. 469); *see also* (Tr. 475-74) (reporting only a facial injury and no spinal damage at the emergency department after April 21, 2010, car wreck).  On examination, Yonke noted that Sanders' lumbosacral spine was tender, and an x-ray showed "mild levoscoliosis centered at L2/3."  (Tr. 470, 528).  Yonke prescribed Sanders a pain killer and instructed him to follow up with the spine center for an MRI.  (Tr. 470).

On July 6, 2010, Sanders told Angela Parente, PA-C, that his back pain was worse after he was punched in his ribs one week earlier.  (Tr. 462).  He also stated that he had wheezing two days earlier, but his wheezing resolved after he used his inhaler.  (Tr. 462).  On examination, Parente noted that Sanders was alert, cooperative, conversant, and oriented.  (Tr. 462-63). Parente prescribed Sanders pain medication.  (Tr. 463).

On April 10, 2012, Sanders told Brendan Hawthorn, MD, that he had hand, shoulder, and knee pain after a fight.  (Tr. 388).  He stated that he was able to ambulate after the fight. (Tr. 388).  On examination, Dr. Hawthorn noted that Sanders had mild pain in his joints, had a normal gait, and was alert and oriented.  (Tr. 389).  An x-ray showed a healed fracture and chronic deformity in Sanders' hand.  (Tr. 414).

On January 2, 2013, Sanders told Valerie Lopez, MD, that he had back pain that had become progressively worse over the previous two weeks after he fell on ice.  (Tr. 433).  He

stated that his pain was a 6/10 when resting and 10/10 with movement.  (Tr. 433).  On examination, Dr. Lopez noted that Sanders was alert and oriented, had full strength, had normal reflexes, and had an antalgic gait.  (Tr. 434).  An MRI showed that Sanders had mild lumbar levoscoliosis and straightened sagittal curvatures.  (Tr. 514-15).  Based on the MRI and observation, Robert Cagle, MD, determined that Sanders' spine was within normal limits and discharged him with instructions to follow up with the spine center to manage his pain. (Tr. 436).

On January 3, 2013, Sanders told Danielle Hoover, DO, that he continued to have back pain, but it was better.  (Tr. 438).  On examination, Dr. Hoover noted that Sanders was alert, oriented, had full strength, had normal reflexes, and had an antalgic gait.  (Tr. 439).  An MRI showed "[d]egenerative changes most severe at L5-S1," but there was "[n]o abnormal enhancement."  (Tr. 512).  Dr. Hoover diagnosed Sanders with lumbar back pain with degenerative changes and gave him pain medication.  (Tr. 439).

On February 5, 2016, Sanders told Donald Renuart, MD, that he had back and abdominal pain.  (Tr. 773).  On examination, Dr. Renuart noted that Sanders was alert and oriented, had no back or hip pain, and had an intact memory.  (Tr. 776).  Sanders declined admission.  (Tr. 777).

In addition to his back-pain complaints, medical records indicate that Sanders went to the emergency department numerous times between 2010 and 2016 due to toothaches, chest pain, shoulder pain, and injuries sustained during fights or nights out drinking.  (Tr. 376, 378-83, 419-22, 424, 427, 441, 445, 450 51, 456, 756, 797, 805-09, 858-63, 889, 908-10).  During his emergency department visits, Sanders was able to effectively communicate his condition and his medical history with his providers.  (Tr. 376, 378-83, 419-22, 424, 427, 441, 445, 450 51, 456, 756, 797, 805-09, 858-63, 889, 908-10).  Emergency department records show that, on examination, Sanders was regularly found to be alert, cooperative, conversant, pleasant, and

4

oriented. (Tr. 376, 382, 419-22, 424, 427, 441, 445, 451, 456, 756, 807-08, 861-62, 889, 909-10). Records also indicate that he was regularly found to have a normal gait and range of motion; appropriate behavior and interaction; normal thought content and processes; normal speech; and fair-to-normal judgment and insight. (Tr. 376, 382, 419-22, 424, 427, 445, 756, 807-08, 861-62, 889, 909-10); but see (Tr. 388-82) (prescribing physical therapy because Sanders had pain and limited motion in his shoulder). On October 19, 2015, and February 4, 2016, Sanders called into a nursing phone line and was able to effectively describe his symptoms and concerns. (Tr. 884-85, 905-06).

### 2. Mental Health Records

On May 19, 2013, Sanders told Thomas Higgins, MD, that he had anxiety and panic attacks, and that his shortness of breath caused his anxiety to get worse. (Tr. 430); *see also* (Tr. 627-29). He stated that he also had chest pain, was under significant stress, and felt depressed. (Tr. 430). On examination, Dr. Higgins noted that Sanders was alert and oriented, and he had normal range of motion, mood, affect, and behavior. (Tr. 430-31). An x-ray showed no acute cardiopulmonary findings. (Tr. 509). Dr. Higgins determined that there were no signs that Sanders' pain was caused by cardiac etiology or indicated a risk for pulmonary embolus, and he diagnosed Sanders with anxiety and chest pain. (Tr. 431).

On July 19, 2013, Sanders told Mallika Lavakumar, MD, that he had feelings of guilt, anxiety, and paranoia. (Tr. 384). He said that he felt hat people were out to get him for no apparent reason, he feared for his safety, and he believed he received messages from the media. (Tr. 384). He said that he had homicidal ideations in the past. (Tr. 384). He said that he had poor sleep, appetite, energy, memory, and concentration. (Tr. 384). Sanders said that he smoked up to one pack of cigarettes per day, actively consumed alcohol, and used marijuana, cocaine, PCP, and ecstasy. (Tr. 385). On examination, Dr. Lavakumar noted that Sanders was

cooperative, depressed, guilty, overwhelmed, paranoid, and delusional.  (Tr. 385).

Dr. Lavakumar noted that Sanders he had had logical and organized thoughts, sustained memory

and attention, and fair insight and judgment.  (Tr. 385).  Dr. Lavakumar diagnosed Sanders with

psychosis, history of depression and anxiety, inadequacy of social support, relationship

problems, unemployment, and stress.  (Tr. 385).  Dr. Lavakumar gave Sanders a GAF score of

51-60, indicating "[s]ome difficulty in functioning."  (Tr. 385).  Dr. Lavakumar prescribed

Sanders antipsychotic medication.  (Tr. 385).  Later, on the same day, Sanders told Melissa

Tscheiner, MD, that he felt worthless, had vague suicidal thoughts, and felt like he wanted to

hurt people.  (Tr. 386).  On examination, Dr. Tscheiner noted that Sanders was oriented, spoke

quietly and slowly, and did not have tangential, flighty, or racing thoughts.  (Tr. 387).

Dr. Tscheiner concurred with Dr. Lavakumar's assessment.  (Tr. 387).

On December 15, 2014, Sanders saw Kimberly Hart-Ogburn, LPC, for counseling intake.

(Tr. 538).  Sanders told Hart-Ogburn that he had symptoms of anxiety – including shaking and

shortness of breath – and that he felt lonely, depressed, low energy, and paranoid.  (Tr. 538).

Sanders said that he was a good worker when he had a job and he liked to play video games.

(Tr. 539).  He said that he had no learning difficulties, barriers to learning, or special

communication needs.  (Tr. 540).  Hart-Ogburn noted that Sanders' functional problems included

depression, anxiety, inattention, substance use, sleep problems, and stress.  (Tr. 542).  Hart

Ogburn also noted that Sanders was cooperative, had average intelligence, and had a logical

thought process.  (Tr. 544).  Hart-Ogburn diagnosed Sanders with severe major depressive

disorder without psychotic features.  (Tr. 537-50).

On January 27, 2015, Mary Harrison, APN, saw Sanders for medication management.

(Tr. 551-55).  Sanders told Harrison that he was first hospitalized when he was 19 because he

was "withdrawn and not coming out of his room for weeks at a time."  (Tr. 553).  Sanders said

that he did not take medication since his first hospitalization.  (Tr. 553).  Sanders said that his symptoms included self-isolation, crying, withdrawal, discouragement, and lack of motivation.  (Tr. 553).  He said that he had a long history of alcohol, crack, marijuana, and PCP use, but he tried to maintain his sobriety.  (Tr. 553).  On examination, Harrison noted that Sanders had clear speech, logical thought processes/content, and fair judgment and insight.  (Tr. 553).  Harrison gave Sanders a GAF score of 45, indicating serious impairment in social functioning.  (Tr. 552).  Harrison diagnosed Sanders with major depression and prescribed him antidepressant medications.  (Tr. 554).  At a follow-up on July 30, 2015, Edward Dutten, MD, did not note any significant changes in Sanders' condition and continued his medications.  (Tr. 978).

On June 23, 2015, police took Sanders to the emergency department and after he reported that he was depressed, anxious, and suicidal after his girlfriend broke up with him.  (Tr. 570-71); *see also* (Tr. 566).  Vincent Izediuno, MD, noted that Sanders was not compliant with his treatment.  (Tr. 571).  On examination, Dr. Izediuno noted that Sanders was depressed, anxious, logical, and oriented.  (Tr. 571).  Dr. Izediuno admitted Sanders to the psychiatric hospital.  (Tr. 573).  Upon admission, Sanders told Amit Mohan, MD, that he was depressed, stressed, and unable to sleep well.  (Tr. 562).  He said that he had racing thoughts and felt powerless, but he tried to work on developing coping skills.  (Tr. 562).  Dr. Mohan noted that Sanders was oriented and cooperative; had intact memory, concentration, and attention; and had linear and concrete thought.  (Tr. 563).  On June 26, 2015, Dr. Mohan discharged Sanders from the psychiatric hospital.  (Tr. 585).  In his discharge notes, Dr. Mohan noted that Sanders was alert, oriented and cooperative; he had intact memory; and he had fair attention and concentration.  (Tr. 585).

On August 28, 2015, Gary Wilkes, MD, noted that Sanders complained about his depression and sleep problems.  (Tr. 599).  Dr. Wilkes noted that sanders' speech was clear, but his mood was irritable, he was evasive, and he had poor insight and judgment.  (Tr. 599).

Dr. Wilkes noted that, although Sanders wanted to focus on his depression and anxiety, he did not appear to be either depressed or anxious. (Tr. 600). Instead, Dr. Wilkes stated that Sanders appeared angry, irritable, and bipolar. (Tr. 600). Dr. Wilkes adjusted Sanders' medications. (Tr. 600).

On October 27, 2015, Bonnie Kaput, APN, noted that Sanders did not pick up the medication that Dr. Wilkes had prescribed in August 2015. (Tr. 968). Sanders told Kaput that he had mood swings and felt anxious, and Kaput noted that Sanders had clear speech and coherent thought processes. (Tr. 967). Kaput continued Sanders' medications. (Tr. 968). At a follow-up on December 15, 2015, Sanders told Kaput that he continued to have mood changes and suicidal ideation, and Kaput again continued his medications. (Tr. 963). On January 12, 2016, Kaput noted that Sanders had clear speech and coherent thought processes, but he continued to have poor judgment and insight. (Tr. 958). She noted that Sanders was not compliant with his medications, but he was compliant with his appointments. (Tr. 958).

On July 13, 2016, Irene Shulga, MD, noted that Sanders was not compliant with his treatment. (Tr. 953). Sanders told Dr. Shulga that he was paranoid and depressed, and that his medications did not help him. (Tr. 953). On examination, Dr. Shulga noted that Sanders was superficially cooperative and had poor concentration. (Tr. 953). Dr. Shulga determined that Sanders' "vague and unspecific symptoms" did not meet criteria for a mood disorder, and that his unstructured daily life probably contributed to his unhappiness and depression. (Tr. 954). Dr. Shulga discontinued Sanders' antipsychotic and bipolar medications, prescribed him an antianxiety medication, referred him to individual counseling, and recommended that he would benefit from a vocational program. (Tr. 954). At a follow-up on October 19, 2016, Dr. Shulga noted that Sanders was evasive and appeared "preoccupied with numerous mobile devices in his possession" during his exam. (Tr. 947). Dr. Shulga noted that Sanders had mild depression

symptoms, but did not meet criteria for major depression, and again recommended that he seek vocational services.  (Tr. 947).  On December 8, 2016, Dr. Shulga did not note any significant changes in Sanders' condition or treatment.  (Tr. 937-44).

On August 23, 2017, Sanders told Patricia Breshear, LSW, that he ran out of medication and self-isolated due to paranoia.  (Tr. 1021).  He said that he wanted help and medication because his "feelings [were] so intense that he [felt] as if he [was] having a heart attack."  (Tr. 1021).  Breshear noted that Sander had depression, anxiety, traumatic stress, anger/aggression, oppositional behaviors, mood swings/hyperactivity, and substance use/addiction.  (Tr. 1026-27).  Based on Sanders' statements that he had difficulty staying focused for long periods and was very impulsive, Breshear found that he had inattention and impulsivity issues.  (Tr. 1026).  Breshear indicated that Sanders needed medication, education to develop skills necessary to enhance success, and job training.  (Tr. 1027).

On September 6, 2017, Daniel Schweld, MD, noted that Sanders had depression and paranoia.  (Tr. 1032).  Sanders told Dr. Schweld that he heard voices and had visions of spirits, shadows, and animals.  (Tr. 1032).  On examination, Dr. Schweld noted that Sanders had coherent thought process/content, clear speech, mildly impaired concentration, intact memory, and limited judgment/insight.  (Tr. 1033).  Dr. Schweld diagnosed Sanders with schizoaffective disorder and prescribed antipsychotic and antidepressant medications.  (Tr. 1033-34).

### C.    Relevant Opinion Evidence

#### 1.    Consultative Examiner—Richard Davis, MA

On April 28, 2015, Richard Davis, MA, conducted a psychological examination.  (Tr. 557-61).  Davis noted that Sanders was not able to read well enough to fill out the office forms.  (Tr. 557).  Sanders told Davis that he left school when he was in the ninth grade because he was in special classes, had failing grades, had trouble getting along with others, and "had a

nervous breakdown." (Tr. 557-58).  Sanders said that he occasionally found work but could not hold down a job because he could not follow instructions and did not show up to work. (Tr. 557-58).  Sanders said that he had a driver's license, but it was suspended because he got a DUI.  (Tr. 558).  Sanders told Davis that he did not have a regular place to sleep, napped during the day when possible, showered and changed clothes about four times per week, did not cook for himself, sometimes did household chores, could not read well, and played video games or watched television when he found a place to stay.  (Tr. 559).  He also said that he looked or jobs on the internet and sometimes attended alcoholics anonymous meetings.  (Tr. 559).  Davis noted that Sanders appeared to give him answers just to move on, and that he would give different answers if the same questions were asked again later.  (Tr. 558).

On examination, Davis noted that Sanders spoke coherently, but it was "nearly impossible" to get information from him.  (Tr. 559).  Davis noted that Sanders had difficulty sleeping due to paranoia, feelings of worthlessness and hopelessness, and anxiety attacks. (Tr. 559-60).  Sanders had difficulty understanding Davis's questions, and he was "extremely limited" in his ability to think logically and use common sense and judgment.  (Tr. 560).

In assessing Sanders' functional abilities, Davis indicated that Sanders had difficulty understanding, remembering, and carrying out even the simplest of instructions.  (Tr. 560).  He noted that Sanders did not pay attention to questions, had extreme difficulty following directions, and did not understand directions.  (Tr. 560).  Davis opined that Sanders would have trouble paying attention, concentrating, getting along with people in positions of authority and fellow coworkers, and dealing with workplace stress and pressure.  (Tr. 560).  Although Davis stated that Sanders had "almost no skills whatsoever to think logically [and] use common sense and judgment," he indicated that Sanders would be "capable of effective money management" if granted benefits.  (Tr. 561).  Finally, Davis stated that his opinion's "validity and reliability

[were] totally absent" because "[g]etting information from [Sanders] was nearly impossible." (Tr. 561).

### 2.    Consultative Examiner—Khalid Darr, MD

On July 9, 2015, Khalid Darr, MD, performed a consultative examination to evaluate Sanders' physical functions.  (Tr. 589-96).  Dr. Darr noted that Sanders ambulated with a normal gait and did not require any assistive devices.  (Tr. 590).  He noted that Sanders had some shortness of breath, when lying flat, but his lungs were clear, and his breath sounds were symmetrical.  (Tr. 591).  There was no evidence of tenderness or spasms in Sanders' spine; he had normal strength in his upper and lower extremities; and he had normal range of motion. (Tr. 592-95).  Dr. Darr opined that Sanders was able to ambulate, push and pull objects, operate hand and foot controls, drive, and travel without any difficulty.  (Tr. 592).

### 3.    Consultative Examiner—Mitchell Wax, Ph.D.

On November 23, 2015, Mitchell Wax, Ph.D., evaluated Sanders' psychological functions.  (Tr. 603-09).  Dr. Wax noted that Sanders did not bring a photo ID to identify himself and "suspiciously said he did not know his Social Security number."  (Tr. 603).  Dr. Wax also noted that Sanders "would not provide clear information about what stops him from working . . . [e]ven when probed" and appeared to make up information.  (Tr. 604, 607).  Dr. Wax noted that Sanders had "glassy" eyes and "appeared high" during his examination, but he denied using drugs or alcohol.  (Tr. 605).  Dr. Wax stated that "[a]ll information in the evaluation [was] suspect and should be checked through primary sources."  (Tr. 607).

Sanders told Dr. Wax that he lived in his girlfriend's house, but also lived in his mother's house for two years before that.  (Tr. 604).  He did not pay rent, received food stamps, and got money from his girlfriend.  (Tr. 604).  Sanders said that he started special education classes in the fourth grade because he had asthma, and that he could not remember why he was expelled in

11

tenth grade. (Tr. 604). Sanders told Dr. Wax that he sometimes did not sleep at all, did not cook, could microwave food, bathed once a week or two weeks, did not do dishes or laundry, and swept once a week. (Tr. 605). Sanders would not give Dr. Wax clear information about what he did in a typical day but said that he did not like being around people and watched television until he went to sleep. (Tr. 605). He said that he played video games for two hours a day and watched television for five hours a day. (Tr. 605). Sanders did not have friends, did not attend church, and did not belong to any clubs, groups, or organizations. (Tr. 605).

On examination, Dr. Wax noted that Sanders' speech was vague and circumstantial. (Tr. 606). Sanders had a depressed mood, appeared angry, and was passive-aggressive. (Tr. 606). Sanders did not appear anxious, but said he had difficulty with trembling, fidgeting, pacing, hyperventilating, panic attacks, and agoraphobia. (Tr. 606). Dr. Wax noted that he could not assess Sanders' cognitive functioning "due to malingering" – i.e., he "intentionally answer[ed] questions incorrectly." (Tr. 606). Dr. Wax noted that Sanders was oriented, had delusional beliefs that people were out to get him, and had a poor flow of conversation and thought. (Tr. 606). Dr. Wax also noted that he could not assess Sanders' memory "due to malingering." (Tr. 606).

Dr. Wax opined that, "if his behavior as seen in the evaluation [was] accurate," Sanders would not be able to understand, remember, and carry out instructions. (Tr. 608). Dr. Wax stated that Sanders would not be able to maintain attention and concentration, respond appropriately to supervisors and coworkers, or respond appropriately to work pressures. (Tr. 608). Dr. Wax also included his "suspect" IQ testing results, indicating that Sanders had a verbal comprehension index score of 66, perceptual reasoning index score of 77, working memory index score of 71, processing speed index score of 68, and full-scale IQ of 59. (Tr. 609).

12

### 4.    State Agency Consultants

On May 22, 2015, state agency consultant Courtney Zeune, Psy.D., evaluated Sanders'
psychological abilities based on a review of the record.  (Tr. 110, 114-15).  Dr. Zeune opined that
Sanders did not meet the paragraph A and paragraph C criteria for affective disorders under
Listing 12.04, intellectual disability under Listing 12.05, or substance addiction disorders under
Listing 12.09.  (Tr. 110).  He also did not meet the paragraph B criteria because he had only
moderate restriction in daily living activities; moderate difficulty maintaining social functioning;
moderate difficulty maintaining concentration, persistence, or pace; and no repeated episodes of
decompensation of extended duration.  (Tr. 110).  Dr. Zeune opined that Sanders had moderate
limitations in his ability to: (1) understand and remember very short simple, and detailed
instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for
extended periods; (4) make simple work-related decisions; (5) complete a normal workday and
workweek without interruptions from psychologically based symptoms; (6) interact
appropriately with the general public; (7) ask simple questions or request assistance; (8) accept
instructions and respond appropriately to criticism from supervisors; (9) get along with
coworkers or peers without distracting them or exhibiting behavioral extremes; (10) interact
appropriately with the general public; and (11) respond appropriately to changes in the work
setting. (Tr. 114-15).  Dr. Zeune opined that Sanders was not limited or not significantly limited
in his ability to: (1) remember locations and work-like procedures; (2) carry out very short and
simple instructions; (3) perform activities within a schedule, maintain regular attendance, and be
punctual within customary tolerances; (4) sustain an ordinary routine without special
supervision; (5) work in coordination with or in proximity to others without being distracted by
them; (6) perform at a constant pace without an unreasonable number and length of rest periods;
(7) maintain socially appropriate behavior; (8) adhere to basic standards of neatness and

13

cleanliness; (9) be aware of normal hazards and take appropriate precautions; (10) travel in unfamiliar places or use public transportation; and (11) set realistic goals or make plans independently of others.  (Tr. 114-15).  On December 11, 2015, Irma Johnston, Psy.D., concurred with Dr. Zeune's opinion.  (Tr. 147, 151-52).

On July 17, 2015, state agency consultant Leslie Green, MD, evaluated Sander's physical abilities based on a review of the medical record.  (Tr. 112-13, 116).  Dr. Green determined that Sanders could occasionally lift up to 50 pounds, frequently lift up to 25 pounds, stand and/or walk for up to 6 hours in an 8-hour workday, sit for up to 6 hours in an 8-hour workday, and push and/or pull without limitation.  (Tr. 112).  Sanders was unlimited in his ability to climb ramps/stairs, balance, stoop, kneel, crouch, handle, finger, and feel.  (Tr. 112-13).  He could frequently crawl, occasionally climb ladders/ropes/scaffolds, and frequently reach overhead.  (Tr. 112-13).  Based on her findings, Dr. Green determined that Sanders was limited to a range of medium work.  (Tr. 116).  On October 14, 2015, Maureen Gallagher, DO, concurred with Dr. Green's opinions.  (Tr. 149-50).

### D.      Relevant Testimonial Evidence

Sanders testified at the ALJ hearing.  (Tr. 42-63).  Sanders said that he lived with his mother "most of the time" and occasionally lived with his cousin.  (Tr. 50).  Sanders said that, on a typical day, he would talk to his cousin and mother and spend time with his mother.  (Tr. 50).  He said that he had his cousin with him "all the time" to make sure he was okay, and that he could not manage his own finances because people would take advantage of his difficulty with math.  (Tr. 45).  He did not participate in social activities and kept to himself, and when he left his house he would either go to his cousin's house or the store.  (Tr. 46).  He said he did not like leaving his house because he believed people were "after" him and trying to scam him.  (Tr. 46).  Sanders said that he could read, write, and follow instructions, but multiple-step instructions took

14

him time to understand.  (Tr. 44-45).  He had help completing his disability application forms because he made mistakes and often entered the wrong information on the forms.  (Tr. 43-44). Sanders said that he could about a block and he could stand for 20 to 30 minutes before he became uncomfortable, and he could lift and carry about "30 pounds."  (Tr. 57, 61-62).

Sanders testified that he could not work because he did not like people and believed people wanted "to do stuff" to him.  (Tr. 53).  He stated that he started being uncomfortable around people in 2014.  (Tr. 55).  He also difficulty concentrating and that he was always "in a zone."  (Tr. 61).  He said that he snapped out of his "zone" when his cousin yelled at him, and that he did not know what he thought about when he was in a "zone."  (Tr. 61).  Sanders also testified that he heard voices that told him to "get away" and saw "demons and stuff." (Tr. 46-47).  He said that he encountered a "demon" a couple days before the hearing, and that his encounter caused him to fall and hurt his face and knee.  (Tr. 48).  Sanders said that his mother and cousin helped "talk him down" when he heard voices and saw things.  (Tr. 51). Sanders was sometimes argumentative and sometimes depressed, which manifested in angry bursts and crying spells.  (Tr. 51-52).  Sanders said that he used "three or four" medications to control his mental health symptoms.  (Tr. 59).

Regarding his physical symptoms, Sanders said he had issues with working, including problems with his asthma, back, and shoulder.  (Tr. 53).  His asthma caused him to have shortness of breath, feel dizzy, and feel fatigued.  (Tr. 58).  He said that his asthma caused him to lose oxygen to his brain, and that "things got worse gradually" after that.  (Tr. 62-63).  Sanders said that he used his asthma inhaler and sometimes used prednisone to control his asthma. (Tr. 56-57).  He said that he had "excruciating" pain in his back, which caused him to be unable to move or stand.  (Tr. 60).  He went to the doctor when he had back pain.  (Tr. 60).

Daniel Simone, a vocational expert ("VE"), also testified at the ALJ hearing.  (Tr. 63-69).
The ALJ asked the VE whether a hypothetical individual with Sanders' age, education, and
experience could work if he was limited to medium work, except that:

> This individual is limited to occupationally climbing ladders, ropes, and scaffolds.
> Can frequently crawl.  Can frequently use the left arm to reach overhead.  No
> limits on the use of the right arm.  Is limited to simple routine type work in a
> non-public setting.  Is limited to up to occasional and superficial interactions with
> coworkers and supervisors.  Superficial is defined as speaking, signaling, asking
> questions, and serving but no conflict resolution or arbitration.

(Tr. 64).  Regarding the "non-public setting" limitation, the ALJ explained that she referred to

Sanders' tendency to "often times . . . not speak or communicate fully and rationally," but that

"some interaction with the public would be acceptable," such as a housekeeper occasionally

running into a hotel/motel guest.  (Tr. 65-66).  The VE testified that such an individual could

work as a hand packager, housekeeping cleaner, hand launderer, or kitchen helper.  (Tr. 64-65).

The ALJ asked if the hypothetical individual described above could work if he were additionally

limited to avoiding concentrated exposure to respiratory irritants.  (Tr. 66).  The VE stated that

such an individual could perform the same jobs as the individual in the first hypothetical.

(Tr. 66).  Finally, the ALJ asked the VE whether an individual with Sanders' age, education, and

experience could work if he were limited to medium work with no additional physical

limitations, but that he was limited to simple routine type work in a non-public setting and

limited to occasional and superficial interactions with coworkers and supervisors.  (Tr. 66).  The

VE testified that such an individual could work as a hand packager, kitchen helper, and hospital

cleaner.  (Tr. 66-67).

Sanders asked if a hypothetical person could work if he were off task 10 percent or more

during the workday.  (Tr. 67).  The VE stated that such an individual could maintain competitive

employment, and that anything over 15 percent off-task time would be work-prohibitive.

(Tr. 67-68).  The VE also stated that work would be precluded if an individual were absent from

16

more than one day per month on a regular basis, or if the individual exceeded ten minutes of tardiness or early departure on a regular basis.  (Tr. 68).  Further, the VE stated that, if an individual had to be redirected six to eight times on each task, work would be precluded. (Tr. 68-69).

## IV.    The ALJ's Decision

The ALJ's January 30, 2018, decision found that Sanders was not disabled and denied his applications for DIB and SSI.  (Tr. 10-29).  The ALJ found that Sanders met the insured status requirements through March 31, 2007, and that Sanders had not engaged in substantial gainful activity since January 1, 2006.  (Tr. 12).  The ALJ determined that Sanders had the severe impairments of: degenerative disc disease, left rotator cuff injury, and personality disorder. (Tr. 12).

The ALJ found that Sanders had no impairment that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15).  In evaluating Sanders' mental impairments, the ALJ considered whether his impairments met or medically equaled the criteria of Listings 12.04 (affective disorders), 12.05 (intellectual disorders), and 12.08 (personality and impulse-control disorders).  (Tr. 14). The ALJ found that Sanders could not satisfy the Paragraph B criteria, because he did not show that he had an extreme limitation in one, or marked limitation in two, of Paragraph B's functional domains – *i.e.*, (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing himself. (Tr. 14-15).  Specifically, the ALJ found that Sanders had only "moderate limitations" in all four domains, because he could: (1) prepare simple meals using a microwave, provide information about his health, and describe his prior work history; (2) spend time with friends and family and live with others; (3) watch TV and play video games; and (4) cooperate during examinations.

17

(Tr. 14-15).  The ALJ also found that Sanders could not satisfy the Paragraph C criteria because he had a more-than-minimal ability to adapt and adjust, and he did not have a medically documented history of two years' treatment in a highly structured setting.  (Tr. 15).

The ALJ determined that Sanders had the RFC to perform medium work, except that he was "limited to simple, routine type work in a nonpublic setting; limited to up to occasional superficial interaction with coworkers and supervisors, defined as speaking, signaling, asking questions, and serving, but no conflict resolution or arbitration."  (Tr. 15).  In assessing Sanders' RFC, the ALJ explicitly stated that she "considered all symptoms" in light of the medical and other evidence in the record.  (Tr. 15).  The ALJ expressly considered Sanders' subjective complaints – including his testimony that "he lost focus and concentration," his testimony that "he did not like leaving the house because he felt people were after him, judging him, and scheming about him," and his examination statements that he was in special education classes and could not maintain employment due to his inability to follow instructions.  (Tr. 16, 21-23).  The ALJ also considered his statements to treatment providers that "he was a 'good worker' when able to find work," that he "read well," and that he "attend[ed] a party and participated in martial arts."  (Tr. 24-25).  The ALJ determined that, although Sanders' medically determinable impairments could reasonably be expected to produce his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 16).

The ALJ stated that he gave "partial weight" to Dr. Davis' opinion, because: (1) the level of limitations described was not consistent with the overall evidence; and (2) Dr. Davis had called into question the validity of his own assessment because it was "nearly impossible" to get answers from Sanders.  (Tr. 25-26).  The ALJ also gave "partial weight" to Dr. Wax's opinion, because: (1) his report summary did not include Sanders' intelligence test results due to his lack

of cooperation; and (2) Dr. Wax questioned the validity of his findings due to Sanders' behavior and suspected malingering. (Tr. 26). The ALJ also gave "great weight" to Dr. Darr's opinion, "little weight" to the Dr. Green and Dr. Zuene's opinions, and "partial weight" to Dr. Gallagher's and Dr. Johnson's opinions. (Tr. 26).

Because the ALJ found that Sanders was unable to perform all or substantially all of the requirements of medium work, she relied on the VE's testimony to determine whether Sanders could work. (Tr. 27-28). Based on the VE's testimony and considering Sanders' RFC, age, education, and experience, the ALJ found that Sanders was "able to perform the requirements of representative occupations such as: (1) Hand Packager; (2) Hand Launderer; (3) Kitchen Helper; and (4) Hospital Cleaner." (Tr. 28) (citations omitted). Based upon her findings, the ALJ determined that Sanders was not disabled from January 1, 2006, through the date of her decision and denied Sanders' applications for DIB and SSI. (Tr. 28-29).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the

evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.    Listings 12.04, 12.05, and 12.08

Sanders argues that substantial evidence did not support the ALJ's conclusion that he did not meet the Paragraph B criterial for Listings 12.04, 12.05, and 12.08.  ECF Doc. 11 at 16-21. Sanders asserts that the ALJ should have found that he had a marked limitation in understanding, remembering, and applying information, because: (1) his answers to questions at the ALJ hearing were unresponsive; (2) he had difficulty comprehending and answering questions from providers/examiners; (3) he needed questions to be repeated often; and (4) Dr. Davis and Dr. Wax opined that he had difficulty understanding, remembering, and carrying out "even the simplest" instructions.  *Id.* at 17-19.  Sanders also contends that the ALJ should have found he had a marked limitation in interacting with others, because he: (1) he only interacted with his mother, sister, and treatment providers; (2) he had a history of not getting along with others in school and past work places; (3) did not interact with his daughter and former girlfriend; and

(4) Dr. Davis and Dr. Wax opined that he could not respond to normal work pressures appropriately or relate to others in the workplace.  *Id.*at 19-20.  Further, Sanders argues that the ALJ should have found he had a marked limitation in maintaining concentration, persistence, and pace.  *Id.* at 20-21.  Sanders explains that, despite stating that he played video games and watched television for 10 hours a day, there was little evidence that he was able to pay attention to the television and Dr. Davis and Dr. Wax opined that he had difficulty maintaining attention and pace.  *Id.*  Finally, Sanders contends that his "marginal existence" and living situation indicated that he had no ability to adapt to changes.  *Id.* at 21.  Thus, Sanders asserts that the ALJ should have found that he satisfied the Paragraph B criteria for Listings 12.04, 12.05, and 12.08. *Id.*

The Commissioner responds that the substantial evidence supported the ALJ's conclusion that Sanders did not meet the Paragraph B criteria for Listings 12.04, 12.05, and 12.08.  ECF Doc. 13 at 9-12.  The Commissioner asserts that evidence supported the ALJ's conclusion that Sanders had only moderate limitations in understanding, remembering, and applying information, including: (1) records indicating that he had logical and organized thought processes, no memory or attention deficits, and average intelligence; and (2) Dr. Johnston's opinion that he had only moderate difficulties in that domain.  *Id.* at 10.  The Commissioner also argues that evidence supported the ALJ's conclusion that Sanders had only moderate limitations in interacting with others, including: (1) records indicating that he was consistently cooperative at examinations; (2) his own testimony that he spent time with family and friends, had a girlfriend, played video games with others, used public transit, participated in partial arts, and attended at least one party; and (3) Dr. Johnston's opinion that he had only moderate limitations. *Id.* at 10-11.  Further, the Commissioner contends that the evidence supported the ALJ's conclusion that Sanders had only moderate limitations in his ability to maintain concentration,

persistence, and pace, including: (1) examination findings that he had intact memory, attention, and concentration; (2) his ability to watch television and play video games for multiple hours a day; and (3) Dr. Johnston's opinion that he had only moderate limitations.  *Id.* at 11.

Sanders' reply brief reiterates his arguments that the ALJ should have found that he met the Paragraph B criteria because he had marked or greater limitations in understanding, remembering, and applying information, interacting with others, and maintaining concentration, persistence, and pace.  ECF Doc. 14 at 3-6.  Sanders asserts that, rather than basing his evaluation of the Paragraph B criteria on the record as a whole, the ALJ cherry-picked evidence to support his own opinion.  *Id.* at 4-5.

For the Court's ease of analysis, I will examine the issues Sanders raises in an order different than he argued them.  At Step Three, the clamant has the burden of proving that he has an impairment or combination of impairments that meet or medically equal a listed impairment.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  The claimant is conclusively presumed disabled if he meets or medically equals a listed impairment; otherwise, the evaluation proceeds to the fourth step.  20 C.F.R. §§ 404.1520(d)-(e), 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A clamant must satisfy all of the criteria to meet the listing.").  "If . . . the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing."  *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013) (quotation and alterations omitted); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011) (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).  Nonetheless, "the ALJ need not discuss listings that the applicant clearly does not meet,

especially when the claimant does not raise the listing before the ALJ." *Sheeks*, 544 F. App'x at 641; *see also Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) (stating that, when an ALJ "did not explicitly state that the appellant's impairments were not contained in the listings, such a determination was implicit in the ALJ's decision" because he proceeded to Step Four). When an ALJ fails to explain adequately why the claimant's impairments did not meet or medically equal a listed impairment, that error is harmless if the claimant does not produce sufficient evidence to show that his impairments met or medically equaled a listed impairment. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

Listing 12.04 establishes the criteria for affective disorders; Listing 12.05 establishes the criteria for intellectual disorders; and Listing 12.08 establishes the criteria for personality and impulse-control disorders. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00, 12.04, 12.05, 12.08. A claimant must show that he meets the severity of Listing 12.04 or Listing 12.08 by showing that he meets both the impairment-specific medical criteria under Paragraph A and the functional limitations criteria in Paragraph B. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A), 12.04, 12.08. The common functional limitations criteria in Paragraph B of Listings 12.04 and 12.08 require the claimant to show that his disorder(s) resulted in an "extreme limitation of one or marked limitation of two, of the following areas of mental functioning: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; (4) adapt or manage oneself." 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.08(B)

Listing 12.05 has unique criteria, that require the claimant to establish that he has "significantly subaverage general intellectual functioning; significant deficits in current adaptive functioning; and evidence that demonstrates or supports (is consistent with) the conclusion that [his] disorder began prior to age 22." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.00(A)(3). Paragraphs A and B of Listing 12.05 provide alternative methods for making this showing, and

24

Paragraph B(2) incorporates the same language in Paragraph B of Listings 12.04 and 12.08.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A)(3), 12.05.  The Paragraph A criteria of Listings 12.04, 12.05, and 12.08 are not relevant to Sanders' arguments.

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence when she determined that Sanders did not have any impairment or combination of impairments that met or medically equaled a listed impairment.  42 U.S.C. §§ 405(g), 1383(c)(3); Elam, 348 F.3d at 125.  Here, the ALJ complied with the regulations when she: (1) considered whether Sanders' medically determinable impairments singly or in combination met or medically equaled the criteria for categorically disabling affective disorders, intellectual disorders, and personality and impulse-control disorders; and (2) explained that Sanders did not meet the paragraph B criteria because he showed only moderate limitations across all four of Paragraph B's functional domains.  Foster, 279 F.3d at 354; 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.05(B), 12.08(B)(2); (Tr. 14-15).  Further, the ALJ explicitly considered the whole record in evaluating Sanders' impairments and did not improperly cherry-pick evidence.  See (Tr. 15).

Substantial evidence also supported the ALJ's conclusion, including: (1) Sanders' own testimony and statements to treatment providers that he could spend time with his mother and cousin, read and follow instructions, play video games for up to two hours and watch television for up to five hours each day, and microwave his own meals; (2) Sanders' ability to cooperate with healthcare providers and describe his symptoms and history of his physical and mental health; and (3) numerous treatment notes indicating that Sanders was oriented and cooperative, and had coherent thought processes, intact to mildly impaired concentration, and intact memory. (Tr. 44-45, 50, 376, 382, 419-22, 424, 427, 441, 445, 451, 462-63, 539-40, 544, 553, 559, 563, 585, 605, 756, 776, 807-08, 861-62, 889, 909-10, 958, 967, 1033).  Here, Sanders' argument –

that the ALJ should have found that he was unable to adapt based on his "marginal existence" and living situation – is unavailing, because evidence supported the ALJ's conclusion that he had only moderate difficulties in adaptation, including: (1) Sander's ability to  seek medical intervention for his different physical and mental ailments; (2) his ability to seek housing and funding from his cousin, mother, and girlfriend; and (3) the state agency consultants' opinions that Sanders was unlimited in his ability to perform activities within a schedule, carry out short and simple instructions, be aware of hazards and take precautions, travel and use public transportation, set realistic goals, and make independent plans.  (Tr. 14-15, 114-15, 151-52, 559, 604).  Moreover, Sanders' arguments that Dr. Davis' and Dr. Wax's opinions would have supported a finding that he met the Paragraph B criteria is unavailing because, as discussed below, the ALJ properly gave only partial weight to their opinions and this court is not permitted to reweigh the evidence.  *See Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.  Accordingly, I recommend that the court affirm the ALJ's conclusion that Sanders did not meet the Paragraph B criteria for Listings 12.04, 12.05, and 12.08.

### C.    Medical Opinions Weight

Sanders argues that the ALJ failed to apply proper legal standards and reach a conclusion supported by substantial evidence in weighing Dr. Davis' and Dr. Wax's opinions.  ECF Doc. 11 at 14-16.  Sanders contends that the ALJ's reasons for giving Dr. Davis' and Dr. Wax's opinions only partial weight – that (1) Dr. Davis said Sanders' examination answers were inconsistent and "nearly impossible" to obtain; and (2) Dr. Wax was concerned about the validity of his examination findings due to Sanders' lack of cooperation, behavior, and possible malingering – were not good reasons.  *Id.* at 15.  Instead, Sanders asserts that his difficulty responding to questions at examinations, in his DIB and SSI applications process, and at the ALJ hearing, show that his psychosis has caused "consistently bizarre [and] unpredictable" behavior that is

"consistent with that of a person with severe intellectual and psychological difficulties." *Id.* Thus, Sanders argues that the ALJ should have given Dr. Davis' and Dr. Wax's opinions great weight. *Id.* at 16.

The Commissioner responds that the ALJ applied proper legal procedures and reached a conclusion supported by substantial evidence in evaluating Dr. Davis' and Dr. Wax's opinions. ECF Doc. 13 at 11-12, 16-19. The Commissioner asserts that the ALJ gave good reasons for discounting their opinions, when he stated that they were inconsistent with other evidence in the record. *Id.* at 18. Further, the Commissioner contends that the ALJ's decision to give only partial weight to Dr. Davis' and Dr. Wax's opinions was supported by substantial evidence, including: (1) findings that Sanders was cooperative, had a stable mood and affect, had intact thought processes, memory, and attention, and had average intelligence; and (2) Dr. Davis' and Dr. Wax's own comments stating that Sanders' false statements, lack of effort, and possible malingering made their findings invalid. *Id.* at 11-12, 16-19.

In his reply brief, Sanders reiterates his arguments that the ALJ should have given Dr. Davis' and Dr. Wax's opinions great weight because any malingering or lack of cooperation was caused by his mental health symptoms. ECF Doc. 14 at 3-5.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (unpublished) (noting that two or three visits "often will not suffice for an ongoing treatment relationship" required for a physician to be a treating source. On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. Instead, an

ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375. An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).

The ALJ applied proper legal standards in weighing the medical opinion evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125. The ALJ complied with the regulations by specifically stating that Dr. Davis' and Dr. Wax's opinions were due only "partial weight." 20 C.F.R. §§ 404.1527, 416.927; (Tr. 25-26). Because they were not treating sources, the ALJ was not required to give controlling weight to, or explain his reasons for giving partial weight to, Dr. Davis' and Dr. Wax's opinions. 20 C.F.R. §§ 404.1527(c), 416.927(c); *Gayheart*, 710 F.3d at 376; *Smith*, 482 F.3d at 876. Nevertheless, the ALJ adequately explained that Dr. Davis' opinion was inconsistent with other evidence in the record, and Dr. Davis and Dr. Wax had both questioned the validity of their examination findings due to Sanders' lack of cooperation and suspected malingering. (Tr. 25-26).[2]

Substantial evidence also supported the ALJ's reasons for giving Dr. Davis' and Dr. Wax's opinions only partial weight. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.

---

[2] This court is not permitted independently to evaluate whether Sanders actually was malingering, and I express no findings on that issue.

Both Dr. Davis and Dr. Wax expressed concerns throughout their examination reports that Sanders did not cooperate, gave inconsistent or unclear answers to examination questions, and appeared to be malingering.  (Tr. 558-59, 561, 603-09).  Moreover, Dr. Wax noted that Sanders appeared high or intoxicated during his examination and IQ testing.  (Tr. 605).  Here, Sander's arguments that his lack of cooperation was a symptom of his impairments which appeared throughout the record is unavailing, because numerous treatment notes indicate to the contrary that Sanders was alert, oriented, and cooperative during treatment and was able to describe his symptoms and medical history clearly.  (Tr. 44-45, 50, 376, 382, 419-22, 424, 427, 441, 445, 451, 462-63, 539-40, 544, 553, 559, 563, 585, 605, 756, 776, 807-08, 861-62, 889, 909-10, 958, 967, 1033).  Further, evidence supported the ALJ's conclusion that the limitations in Dr. Davis' opinion were not consistent with the overall record, including: (1) Sanders own testimony and statements to treatment providers that he could spend time with his mother and cousin, read and follow instructions, play video games for up to two hours and watch television for up to five hours each day, and use a microwave; (2) treatment notes indicating that Sanders was alert, oriented, conversant, and cooperative with his providers; (3) notes indicating that Sanders had logical and organized thought processes, intact memory and attention, average intelligence, no learning difficulties, and no special communication needs; (4) treatment notes indicating that Sanders could control his anxiety and paranoia through medication and understood the need to develop coping skills, but did not comply with treatment; and (5) Dr. Zeune's and Dr. Johnston's opinions that Sanders had only moderate mental limitations and was unlimited in remembering work procedures, carrying out simple instructions, sustaining an ordinary routine, work in coordination with or in proximity to others, perform at a constant pace, set realistic goals, and make independent plans.  (Tr. 44-45, 50, 376, 382, 385, 419-22, 424, 427, 431, 441, 445, 451,

462-63, 539-40, 544, 553-54, 559, 562-63, 571, 585, 600, 605, 756, 776, 807-08, 861-62, 889, 909-10, 937-44, 953-54, 958, 963, 967, 978, 1027, 1033-34).

Thus, because substantial evidence supported the ALJ's conclusions that Dr. Davis' and Dr. Wax's opinions were inconsistent with the evidence as a whole and of questionable validity, the ALJ's decision to give only partial weight to Dr. Davis' and Dr. Wax's opinions fell within the Commissioner's "zone of choice." *Mullen*, 800 F.2d at 545. Accordingly, I recommend that the court reject Sanders' argument that the ALJ's decision to give partial weight to Dr. Davis' and Dr. Wax's opinions was error.

### D.    Residual Functional Capacity and Disability Determination

Sanders argues that the ALJ failed to apply proper legal standards and reach a conclusion supported by substantial evidence in evaluating his RFC. ECF Doc. 11 at 21-24. Specifically, Sanders contends that the ALJ's failure to account for his absenteeism and off-task behavior in crafting his RFC violated SSR 96-8's requirement – that the ALJ base the RFC assessment on all the relevant evidence in the case record. *Id.* at 22. Sanders also asserts that medical records, consultative examination reports, and his own testimony showed that he would be off-task more than 15% of the workday and miss more than one day of work per month. *Id.* Further, Sanders asserts that his need for constant supervision would preclude competitive employment. *Id.* at 23. Finally, based on the VE's testimony that such absenteeism and off-task behavior would preclude competitive employment, Sanders argues that the ALJ should have found him disabled at Step Five. *Id.* at 22-24.

The Commissioner argues that the ALJ applied proper legal procedures and reach a conclusion supported by substantial evidence in evaluating Sanders' RFC. ECF Doc. 13 at 12-20. The Commissioner asserts that the ALJ considered all the record evidence in evaluating Sanders' physical and mental symptoms. *Id.* at 13, 15. The Commissioner also contend that the

ALJ did not err by not limiting Sanders to work permitting him to be off task 15% of the time or absent more than once a month, because evidence did not show that he would be unable to attend work or maintain his concentration at work. *Id.* at 19-20. Specifically, the Commissioner argues that evidence did not support the severity of Sanders' alleged off-task time and absenteeism, including: (1) records showing he had an intact memory, attention, and concentration; and (2) Sanders' own testimony that he watched TV for eight to ten hours per day and played video games for multiple hours. *Id.* at 20. The Commissioner also asserts that Sanders' testimony that he went outside two to three times per week did not support his alleged absenteeism, because he did not testify that he could not go outside more often if he chose to do so. *Id.* at 19-20. Sanders did not address this issue in his reply brief. *See generally* ECF Doc. 14.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that

the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A vocational

expert's testimony in response to a hypothetical question is substantial evidence when the

question accurately portrays the claimant's RFC.  *See id.* (stating that "substantial evidence may

be produced through reliance on the testimony of a vocational expert (VE) in response to a

'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual

physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of

Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's

hypothetical question must "accurately portray[] a claimant's vocational abilities and

limitations").  "An ALJ is only required to incorporate into a hypothetical question those

limitations [she] finds credible."  *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health &

Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the

record, it need not reflect the claimant's unsubstantiated complaints.").

The ALJ applied proper legal standards and reached a conclusion supported by

substantial evidence in determining that Sanders had the RFC to perform a range of medium

work, notwithstanding, and unlimited by, his alleged absenteeism and off-task behavior.  42

U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.  Here, the ALJ complied with the

regulations – including SSR 96-8p – by considering all of Sanders' impairments in light of the

medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 416.920(e); SSR 96-8p,

1996 SSR LEXIS 5; (Tr. 15-26).  Further, evidence in the record supported the ALJ's decision

not to include limitations indicating that Sanders would be absent from work or off task more

than customarily tolerated, including: (1) Sanders' own testimony and statements to treatment

providers that he could read and follow instructions and watch television or play video games for

several hours a day; (2) treatment notes indicating that Sanders was alert and oriented and had

intact attention; (3) nurse Kaput's treatment notes, indicating that Sanders was able to keep his

appointments despite being noncompliant with his medications; (4) treatment notes indicating that he did not have a physical impairment that would prevent him from attending work, because he had a normal gait, had a full range of motion, and could control his asthma symptoms with medication; (5) Dr. Zeune's and Dr. Johnston's opinions that Sanders had only moderate limitations in maintaining attention and concentration and was unlimited in his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine, perform at a constant pace without unreasonable breaks, and travel or use public transportation. (Tr. 44-45, 114-15, 151-52, 376, 382, 385, 389, 395, 419-22, 424, 427, 430-31, 434, 439, 441, 445, 451, 456, 462-63, 474-75, 483, 539-40, 544, 553, 559, 563, 585, 592, 605, 756, 776, 807-08, 861-62, 889, 909-10, 958). Thus, this court should not disturb the ALJ's conclusion that Sanders could perform a range of medium work, notwithstanding, and unlimited by, his alleged absenteeism and off-task behavior. *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.

The ALJ also applied proper legal standards and reached a conclusion supported by substantial evidence in determining that Sanders was not disabled at Step Five. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125. Because the ALJ did not find that Sanders had limitations that would cause him to be absent from work or off-task more than customarily tolerated, the ALJ was not required to incorporate such a limitation into his RFC finding and hypothetical questions to the VE. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 15-26). Further, because the ALJ's hypothetical questions to the VE accurately represented the ALJ's ultimate RFC finding, the VE's testimony – that Sanders could work as a hand packager, hand launderer, kitchen helper, and hospital cleaner – was substantial evidence supporting the ALJ's finding that Sanders was not disabled. *Howard*, 276 F.3d at 238; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); (Tr. 15, 63-67). Thus, the ALJ properly

concluded that Sanders was not disabled under the Social Security Act and denied his applications for DIB and SSI, and the court should not disturb that decision. 42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.

**VI.    Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Sanders' applications for disability insurance benefits and supplemental security income be AFFIRMED.

Dated: June 5, 2019

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).